UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CASE NO.05-11283-NG

| | |
|---|---|
| TERESA A. MCCOY | ) |
| Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| PRUDENTIAL INSURANCE COMPANY | ) |
| OF AMERICA | ) |
| STATE STREET CORPORATION | ) |
| Defendants | ) |

**MEMORANDUM IN SUPPORT OF
MOTION OF PLAINTIFF TERESA MCCOY
THAT THE DENIAL OF SHORT TERM DISABILITY BENEFITS CLAIM
BY PRUDENTIAL INSURANCE COMPANY OF AMERICA
WITH STATE STREET CORPORATION
IS GOVERNED BY MASSACHUSETTS LAW**


**INTRODUCTION**


In accordance with the Scheduling Order of this Court adopted on April 3, 2006, the

plaintiff moves to have this Court establish the denial of the Short Term Disability Claim by

Prudential Insurance Company of America ("Prudential") and State Street Corporation ("State

Street") is governed by Massachusetts law rather than ERISA.. With regard to the Long Term

Disability Benefits claim, the plaintiff sought application of the de novo standard of review

under ERISA[1].

At issue in this motion is the Department of Labor's regulation at 29 C.F.R. §

_____

[1]On June 22, 2006, plaintiff filed a motion seeking de novo review under ERISA of the
Long Term Disability Benefits claim ("LTD"). Prudential was the sole decision maker on the
LTD claim.

2510.3-1(b), which states that an employer's "payroll practices" are not ERISA welfare benefit plans, and thus subject to state law, rather than ERISA. Under this regulation, "payroll practices" include:

> [p]ayment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as a pregnancy, a physical exam or psychiatric treatment).

In other words whether State Street's short-term disability benefit program ("STD"), which pays out of its general assets the salary of an employee while he or she cannot work due to sickness or accidental injury, is a "payroll practice" under 29 C.F.R. § 2510.3-1(b), and therefore exempt from the definition of a "welfare benefit plan" under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002.

## STATEMENT OF FACTS[2]

1. Teresa McCoy  was employed by State Street Corporation for more than ten years, and if entitled to Short Term Disability benefits would have been paid 100% of wages.

2. As an employee of State Street Bank Corporation ("State Street"), Teresa McCoy was provided with short term disability benefits as part of a pay roll practice plan by State as the "State Street Bank and Trust Company Administrative Services for Short Term Disability Plan ("STD Plan"). This is set forth in the pertinent pages from the STD Plan as EXHIBIT A[3].

3. Although the STD Plan claims are adjusted by Prudential, the benefits paid under the STD

---

[2]These facts are reasonably believed not to be disputed.

[3]The pages contain number stamps added by Prudential or its counsel identified as TM 00036 - 00073.

Plan are paid solely by State Street which pays up to 100% of the plaintiff's wages for a period of up to twenty (26) weeks.

ERISA regulates "employee welfare benefit plans," which include plans that provide employees "benefits in the event of sickness, accident, [or] disability." 29 U.S.C. § 1002(1). ERISA also broadly preempts state laws relating to any employee benefit plan. 29 U.S.C. § 1144(a). However, the Secretary of Labor has promulgated a regulation that excludes certain "payroll practices" from the application of ERISA. That regulation provides that an "employee benefit welfare plan" shall not include:

> Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons . . . .

29 C.F.R. § 2510.3-1(b)(2).

Here, because short term disability payments under State Street's STD Plan are payments of normal compensation out of State Street's general assets, the STD Plan is a Payroll Practice that is exempted from ERISA's coverage. Because ERISA does not apply here, the STD claim is subject to contract laws of the Commonwealth of Massachusetts, and the usual discovery allowed, rather than the restrictive discovery procedure argued for by defendants in ERISA welfare benefits litigation.

**LEGAL ARGUMENT**

**I.     STATE STREET'S STD PLAN IS A "PAYROLL PRACTICE" UNDER 29 C.F.R. SECTION 2510.3-1(B)(2), AND THEREFORE IS EXCLUDED FROM ERISA'S DEFINITION OF A "WELFARE BENEFIT PLAN"**

ERISA covers two types of "employee benefit plans" -- "employee pension benefit plans," which primarily provide retirement income, and "welfare benefit plans," which provide other types of benefits such as medical care and disability insurance. 29 U.S.C. § 1002. As relevant here, ERISA Section 3(1) defines "employee welfare benefit plan" as:

> any plan, fund, or program ... maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ..., medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits....

29 U.S.C. § 1002(1).

The statute gives the Secretary of Labor broad rule-making authority and specifically authorizes the Secretary to define the statute's technical and trade terms. 29 U.S.C. § 1135. The Supreme Court has made clear that the Secretary's regulatory choices in this regard are entitled to deference so long as they are reasonable. Massachusetts v. Morash, 490 U. S. 107, 116 (1989). At issue in this case is the Secretary's regulation at 29 C.F.R. § 2510.3-1(b), which states that an employer's "payroll practices" are not ERISA welfare benefit plans. Under this regulation,

4

"payroll practices" include:

> [p]ayment of an employee's normal compensation, out of the employer's general
> assets, on account of periods of time during which the employee is physically or
> mentally unable to perform his or her duties, or is otherwise absent for medical
> reasons (such as a pregnancy, a physical exam or psychiatric treatment).

29 C.F.R. § 2510.3-1(b)(2).

State Street's STD Plan fits neatly into the regulation's definition of a "payroll practice."

The STD Plan pays an employee's compensation out of State Streets's general assets "for those

periods of time when a Plan participant is disabled within the meaning of the Plan." EXHIBIT A,

p. TM 00046. For long term employees such as the plaintiff, the plan pays 100% of wages.

Therefore, the STD Planclearly is a payroll practice and not an ERISA plan.

The Secretary's Advisory Opinions consistently have confirmed that programs like the

STD Planmeet the definition of a payroll practice under Section 2510.3-1(b). For example, the

Secretary concluded that two programs offered by Toyota Motor Manufacturing were payroll

practices rather than ERISA plans. Like the STD Plan at issue here, Toyota's programs paid out

of general corporate assets up to 100% of the salary of employees who were rendered incapable

of performing their jobs by a physical or mental condition.The Secretary found that because

Toyota's programs made payments "from the general assets of the Employer for absence due to

certain medical reasons and that such payments either equal, or represent a significant portion of,

an employee's normal compensation, but in no event exceed an employee's normal

compensation," they were "payroll practices" under Section 2510.3-1(b), and therefore were not

ERISA plans. 93-27A Advisory Opinion (Oct. 12, 1993); see also, 93-20A Advisory Opinion

(July 16, 1993) (same); 93-02A Advisory Opinion (Jan. 12, 1993) (same); and 92-18A Advisory

Opinion (Sept. 30,1992) (same). EXHIBIT B - copies of DOL opinions.

The Secretary's Advisory Opinions leave little doubt that State Street's STD Plan constitutes a payroll practice exempt from coverage under ERISA. See McMahon v. Digital Equipment Corp., 944 F. Supp. 70 (D. Mass. 1996) (Employee sufficiently argued that short term disability was "payroll practice plan").

### II. DISABILITY BENEFIT PAYMENTS OF LESS THAN 100% OF BASE PAY STILL QUALIFY AS "NORMAL COMPENSATION" UNDER THE PAYROLL PRACTICE EXCEPTION TO ERISA,

Plaintiff anticipates Prudential and State Street will argue that a disability benefit payment of less than 100% of base pay does not qualify as "normal compensation", and thus the payroll practice exception does not apply here. In this case, the plaintiff's longevity with State Street entitles her to 100% of wages. As set forth more fully below, this argument has been tried in many courts across the United States of America and has failed each time.

The Payroll Practice exception requires "payment of an employee's normal compensation." Under State Street's and Prudential's anticipated analysis, the STD Plan at issue provides less than 100% of wages for certain employees depending on their length of service as State Street. That is not the case for the plaintiff but is for others. Thus, State Street and Prudential may argue that since the STD Plan does not "fully" compensate the employee by paying 100% of the employee's normal compensation, it does not qualify for the payroll practice exemption.

A brief survey of other cases that have considered this issue demonstrates that defendants' position is not well-taken. In Williams v. Great Dane Trailer Tennessee Inc., 1995

6

WL 447268, * 1 (W.D.Tenn., January 20, 1995), the Court was presented with the identical

argument expected to be made by State Street and Prudential regarding the STD Plan. In that

case, like this one, it was uncontested that the short-term disability benefits were paid out of

defendant's general assets, and not out of a special trust or fund. In addition, it was also

undisputed that the plan provided all qualifying employees with benefits of only $135 a week,

not their normal compensation. The plaintiff argued that because the plan provides benefits in an

amount less than plaintiffs normal compensation, the plan did not fall within the payroll

practices exemption to ERISA. In rejecting this argument, the Court set forth the following in

support of its conclusion:

> The Department of Labor has issued several opinion letters, however, in which it has found plans which provide less than an employee's normal compensation to be payroll practices. See, e.g., Department of Labor PWBP Opinion Letter 93-27A, 1993 WL 421012 (Oct. 12, 1993); Department of Labor PWBP Opinion Letter 93-20A, 1993 WL 323133 (July 16, 1993); Department of Labor PWBP Opinion Letter 92-18A, 1992 WL 328699 (Sept. 30, 1992) (all available on WESTLAW ERISA database). The Department's position is that providing benefits equivalent to an employee's normal compensation is not a minimum requirement for the exemption, but a maximum cap. Payment of less than normal compensation from an employer's general assets, therefore, can constitute an employer payroll practice exempt from ERISA.

Williams., 1995 WL 447268 at *1-2;

Given this authority, Plaintiff respectfully submits that the reasoning in Williams is

persuasive and that State Street's STD Plan is a payroll practice and not an employee benefit

plan as defined in the regulations.

## CONCLUSION

Plaintiff requests that this Court determine that benefits under the STD Plan must be decided under laws of the Commonwealth of Massachusetts.

**TERESA A. MCCOY**
*/s/ Jonathan M. Feigenbaum*

_____

Jonathan M. Feigenbaum, Esq
Phillips & Angley
B.B.O. N#546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114.
Tel. No. : (617) 367-8787

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on this 23rd day of June 2006.

*/s/ Jonathan M. Feigenbaum*

L:\LITG\Tmcc001\Memo STD Review Scanned.wpd

EXHIBIT A

# State Street Bank and Trust Company

Administrative Services for
Short Term Disability Plan



TM 00042

# Benefit Highlights

## SHORT TERM DISABILITY PLAN

This short term disability plan is provided for you by State Street Bank and Trust Company

This plan provides financial protection by paying a portion of your income while you are disabled. The amount you receive is based on the amount you earned before your disability began. In some cases, you can receive disability payments even if you work while you are disabled. Benefits start after the elimination period.

Program Date:    January 1, 2001

Program Number: 23403

Covered Classes: All Employees who are enrolled for the Short Term Disability Plan

Minimum Hours
Requirement:    Full-time Employees must be working at least 29 hours per week
                Part-time Employees must be working at least 20 hours per week.

Employment
Waiting Period:   You may need to work for your Employer for a continuous period before you
                  become eligible for the plan.

                  Your Employer will let you know about this waiting period

Elimination
Period:           4 days for disability due to accident;
                  4 days for disability due to sickness.

                  **Benefits begin the day after the Elimination Period is completed.**

Weekly Benefit:   Length of Service              Weekly Benefit

| | Length of Service | Number of Weeks at 100% of weekly earnings | Number of Weeks at 50% of weekly earnings |
|---|---|---|---|
| | 0 to 1 year* | 2 weeks | 24 weeks |
| | 2 years | 5 weeks | 21 weeks |
| | 3 years | 7 weeks | 19 weeks |
| | 4 years | 10 weeks | 16 weeks |
| | 5 years | 12 weeks | 14 weeks |
| | 6 years | 15 weeks | 11 weeks |
| | 7 years | 17 weeks | 9 weeks |
| | 8 years | 20 weeks | 6 weeks |
| | 9 years | 22 weeks | 4 weeks |
| | 10 or more years | 26 weeks | |

Your benefit may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered under this plan.

1

TM 00043

\* Employees hired between January and June are eligible for two weeks of STD payments at 100% of salary and 50% thereafter up to the 26 week maximum. Those hired between July and December are eligible for one week at 100% during the calendar year in which they were hired and 50% thereafter up to the 26 week maximum. For employees normally scheduled to work at least 20 but less than 29 hours per week, the benefit calculation is based upon the normal work schedule in place prior to the onset of disability.

**Maximum Period
of Benefits:**    26 weeks.

**Cost of
Coverage:**    The short term disability plan is provided to you on a non-contributory basis. The entire cost of your coverage under the plan is being paid by your Employer.

The above items are only highlights of your coverage. For a full description please read this entire program document.

**TM 00044**

# Table of Contents

BENEFIT HIGHLIGHTS - SHORT TERM DISABILITY PLAN ............................................................ 1

GENERAL PROVISIONS ............................................................................................................... 4

SHORT TERM DISABILITY COVERAGE - BENEFIT INFORMATION ............................................ 7

SHORT TERM DISABILITY - CLAIM INFORMATION .................................................................. 13

GLOSSARY ................................................................................................................................. 15

TM 00045

# General Provisions

### General Definitions used throughout this program document include:

*You* means a person who is eligible for coverage under the Program.

*Employee* means a person who is in active employment with the Employer for the minimum hours requirement.

*Plan* means a line of coverage under the Program.

### When Are You Eligible for Coverage?

If you are working for your Employer in a covered class, the date you are eligible for coverage is the later of

*   the plan's program date; and

*   the day after you complete your *employment waiting period*

*Employment waiting period* means the continuous period of time that you must be in a covered class before you are eligible for coverage under a plan.

### When Does Your Coverage Begin?

When your Employer pays the entire cost of your coverage under a plan, you will be covered at 12:01 a.m. on the date you are eligible for coverage, provided you are in *active employment* on that date

*Active employment* means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least 29 hours per week if you are a full-time Employee, 20 hours per week if you are a part-time Employee

Your worksite must be

*   your Employer's usual place of business;

*   an alternate work site at the direction of your Employer other than your home unless clear specific expectations and duties are documented, or

*   a location to which your job requires you to travel.

Normal vacation is considered active employment.

Temporary and seasonal workers are excluded from coverage.

Individuals whose employment status is being continued under a severance or termination agreement will not be considered in active employment

4

*Evidence that you qualify for coverage* means a statement of your medical history which will be used to determine if you are approved for coverage. This evidence will be provided at your own expense.

## What If You Are Absent from Work on the Date Your Coverage Would Normally Begin?

If you are absent from work due to injury, sickness, temporary layoff or leave of absence your coverage will begin on the date you return to active employment.

## Once Your Coverage Begins, What Happens If You Are Temporarily Not Working?

If you are on a temporary **layoff**, and if any required contribution is paid, you will be covered to the end of the month following the month in which your temporary layoff begins.

If you are on a *leave of absence*, and if any required contribution is paid, you will be covered for a period of time that has been agreed to in advance in writing by your Employer.

With respect to leave under the federal Family and Medical Leave Act of 1993 (FMLA) or similar state law, continuation of coverage under the plan during such leave will be governed by your Employer's policies regarding continuation of such coverage for non-FMLA leave purposes and any applicable law.

If you are working less than 29 hours per week (if full-time) or less than 20 hours per week (if part-time), for reasons other than disability, and if any required contribution is paid, you will be covered to the end of the month following the month in which your reduced hours begin.

*Layoff or leave of absence* means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer, other than for reasons in connection with any severance or termination agreement. Your normal vacation time, any period of disability or FMLA leave is not considered a temporary layoff or leave of absence.

## When Will Changes to Your Coverage Take Effect?

Once your coverage begins, any increased or additional coverage will take effect immediately upon the effective date of the change, if you are in active employment or if you are on a covered layoff or leave of absence. If you are not in active employment due to injury or sickness, any increased or additional coverage will begin on the date you return to active employment. Any decrease in coverage will take effect immediately upon the effective date of the change. Neither an increase nor a decrease in coverage will affect a *payable claim* that occurs prior to the increase or decrease.

*Payable claim* means a claim for which State Street Bank and Trust Company is liable under the terms of the Program.

## When Does Your Coverage End?

Your coverage under the Program or a plan ends on the earliest of:

5

- the date the Program or a plan is canceled;

- the date you are no longer a member of the covered classes;

- the date your covered class is no longer covered;

- the last day of the period for which you made any required contributions;

- the last day you are in active employment except as provided under the temporary absence from work provisions; or

- the date you are no longer in active employment due to a disability that is not covered under the plan.

6

TM 00048

# Short Term Disability Coverage

## BENEFIT INFORMATION

### How Is Disability Defined?

During the elimination period, you are disabled when

- you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and

- you are not working at any job.

After the elimination period, you are disabled when:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in weekly earnings due to the same sickness or injury.

The loss of a professional or occupational license or certification does not, in itself, constitute disability

You may be required to be examined by specified doctors, other medical practitioners or vocational experts. Your Employer will pay for these examinations. Examinations may be required as often as it is reasonable to do so. You may also be required to be interviewed by an authorized representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

*Material and substantial duties* means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, you will be considered able to perform that requirement if you are working or have the capacity to work 40 hours per week

*Regular occupation* means the occupation you are routinely performing when your disability begins  Your occupation will be looked at as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

*Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth.  Disability must begin while you are covered under the plan.

*Injury* means a bodily injury that is the direct result of an accident and not related to any other cause.  Injury which occurs before you are covered under the plan will be treated as a sickness  Disability must begin while you are covered under the plan.

**TM 00049**

## How Long Must You Be Disabled Before Your Benefits Begin?

You must be continuously disabled through your *elimination period*. Your disability will be treated as continuous if your disability stops for 5 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period for disability due to an accident which begins while you are covered is 4 days, your elimination period for disability due to a sickness which begins while you are covered is 4 days

*Elimination period* means a period of continuous disability which must be satisfied before you are eligible to receive benefits under the plan.

## When Will You Begin to Receive Disability Payments?

You will begin to receive payments when your claim is approved, providing the elimination period has been met. You will be sent a payment every two weeks for any period for which your Employer is liable.

## How Much Will You Be Paid If You Are Disabled and Not Working?

This process will be followed to figure out your *weekly payment*:

1.  Multiply your weekly earnings by your benefit percent shown below.

| Length of Service | Weekly Benefit | |
|---|---|---|
| | Number of Weeks at 100% of weekly earnings | Number of Weeks at 50% of weekly earnings |
| 0 to 1 year* | 2 weeks | 24 weeks |
| 2 years | 5 weeks | 21 weeks |
| 3 years | 7 weeks | 19 weeks |
| 4 years | 10 weeks | 16 weeks |
| 5 years | 12 weeks | 14 weeks |
| 6 years | 15 weeks | 11 weeks |
| 7 years | 17 weeks | 9 weeks |
| 8 years | 20 weeks | 6 weeks |
| 9 years | 22 weeks | 4 weeks |
| 10 or more years | 26 weeks | |

* Employees hired between January and June are eligible for two weeks of Short Term Disability payments at 100% of salary and 50% thereafter up to the 26 week maximum. Those hired between July and December are eligible for one week at 100% during the calendar year in which they were hired and 50% thereafter up to the 26 week maximum. For employees normally scheduled to work at least 20 but less than 29 hours per week, the benefit calculation is based upon the normal work schedule in place prior to the onset of disability

2   Subtract from your gross disability payment any deductible sources of income

That amount figured in item 2 is your weekly payment.

8

TM 00050

After the elimination period, if you are disabled for less than 1 week, you will be sent 1/7 of your payment for each day of disability.

*Weekly payment* means your payment after any deductible sources of income have been subtracted from your gross disability payment.

*Weekly benefit* means the total benefit amount for which you are covered under this plan subject to the maximum benefit.

*Gross disability payment* means the benefit amount before any deductible sources of income and disability earnings are subtracted.

*Deductible sources of income* means income from deductible sources listed in the plan that you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

## What Are Your Weekly Earnings?

*Weekly earnings* means your gross weekly income from your Employer in effect just prior to your date of disability including shift differential pay  Weekly earnings does not include income received from commissions, bonuses, overtime pay, any other extra compensation, or income received from sources other than your Employer.

## What Will Be Used to Determine Weekly Earnings If You Become Disabled During a Covered Layoff or Leave of Absence?

If you become disabled while you are on a covered layoff or leave of absence, your weekly earnings from your Employer in effect just prior to the date your absence begins will be used.

## How Much Will You Be Paid If You Work While You Are Disabled?

If you are disabled and return to work after satisfying the elimination period, you will be sent the weekly payment if your weekly *disability earnings*, if any, are less than 20% of your weekly earnings

If you are disabled and your weekly disability earnings are from 20% through 80% of your weekly earnings, you will receive payments based on the percentage of income you are losing due to your disability.  This process will be followed to figure out your weekly payment.

1.  Subtract your disability earnings from your weekly earnings.

2   Divide the answer in item 1 by your weekly earnings.  This is your percentage of lost earnings.

3.  Multiply your weekly payment as shown above by the answer in item 2

This is the amount you will be paid for each week.

You may be required to send proof of your disability earnings each week  Your weekly payment will be adjusted based on your disability earnings.  As part of your proof of disability earnings, you may be required to send appropriate financial records, including copies of your IRS federal income tax return, W-2's and 1099's, which are necessary to substantiate your income

**TM 00051**

You will not be paid for any week during which disability earnings exceed 80% of weekly earnings.

*Disability earnings* means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to the greatest extent possible. This would be the greatest extent of work, based on your restrictions and limitations, that you are able to do in your regular occupation, that is reasonably available. Salary continuance paid to supplement your disability earnings will not be considered payment for work performed.

## What Happens If Your Disability Earnings Fluctuate?

If your disability earnings are expected to fluctuate widely from week to week, your disability earnings may be averaged over the most recent 3 weeks to determine if your claim should continue subject to all other terms and conditions in the plan.

If your disability earnings are averaged, your claim will end if the average of your disability earnings from the last 3 weeks exceeds 80% of weekly earnings.

You will not be paid for any week during which disability earnings exceed 80% of weekly earnings.

## What Are Deductible Sources of Income?

The following deductible sources of income will be deducted from your gross disability payment

1    The amount that you receive or are entitled to receive as loss of time disability income payments under any state compulsory benefit *act* or *law*.

2.    The amount that you receive, due to your disability, from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise.

Only deductible sources of income which are payable as a result of the same disability will be subtracted

*Law, plan or act* means the original enactment of the law, plan or act and all amendments.

## What If Subtracting Deductible Sources of Income Results in a Zero Benefit? (Minimum Benefit)

The minimum weekly payment is $25.00.

This amount may be applied toward an outstanding overpayment.

## What Happens When You Receive a Cost of Living Increase from Deductible Sources of Income?

Once any deductible source of income has been subtracted from your gross disability payment, your payment will not be further reduced due to a cost of living increase from that source

TM 00052

### What If It Is Determined that You May Qualify for Deductible Income Benefits?

If it is determined that you may qualify for benefits under item 1 or 2 in the deductible sources of income section, your entitlement to these benefits will be estimated. Your payment may be reduced by the estimated amount if such benefits have not been awarded.

However your payment will NOT be reduced by the estimated amount under item 1 or 2 in the deductible sources of income section if you:

* apply for the benefits,

* appeal any denial to all necessary administrative levels; and

* sign a reimbursement agreement form. This form states that you promise to pay back any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when proof is received

* of the amount awarded; or

* that benefits have been denied and all necessary appeals have been completed. In this case, a lump sum refund of the estimated amount will be made to you.

### What Happens If You Receive a Lump Sum Payment?

If you receive a lump sum payment from any deductible source of income, the lump sum will be pro-rated on a weekly basis over the time period for which the sum was given. If no time period is stated, a reasonable one will be used.

### How Long Will Payments Continue to Be Sent to You?

A payment will be sent to you every two weeks up to the *maximum period of payment*. Your maximum period of payment is 26 weeks during a continuous period of disability.

Payments will no longer be sent to you and your claim will end on the earliest of the following:

1. When you are able to work in your regular occupation on a *part-time basis* but you choose not to.

2. The end of the maximum period of payment.

3. The date you are no longer disabled under the terms of the plan.

4. The date you fail to submit satisfactory proof of continuing disability

5. The date your disability earnings exceed the amount allowable under the plan.

6. The date you die.

*Maximum period of payment* means the longest period of time payments will be made to you for any one period of disability.

*Part-time basis* means the ability to work and earn between 20% and 80% of your weekly earnings

TM 00053

## What Disabilities Are Not Covered Under Your Plan?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your

- intentionally self-inflicted injuries,

- active participation in a riot;

- commission of a crime for which you have been convicted under state or federal law; or

- *occupational sickness or injury.* However, disabilities due to occupational sicknesses or injuries for partners or sole proprietors who cannot be covered by workers' compensation law will be covered.

Your plan does not cover a disability due to war, declared or undeclared, or any act of war.

A payment will not be made for any period of disability during which you are incarcerated as a result of a conviction.

---

*Occupational sickness or injury* means an injury arising out of, or in the course of, any work for wage or profit regardless of employer, or a sickness covered, with respect to such work, by any workers' compensation law, occupational disease law or similar law.

---

## What Happens If You Return to Work and You Become Disabled Again?

1    If your current disability is related or due to the same cause(s) as your prior disability for which you received a payment:

Your current disability will be treated as part of your prior claim and you will not have to complete another elimination period if you return to active employment for your Employer for 30 consecutive days or less   Your disability will be subject to the same terms of the plan as your prior claim

2.   If your current disability is unrelated to your prior disability for which you received a payment

Your current disability will be treated as a new claim and you will have to complete another elimination period   Your disability will be subject to all of the plan provisions.

If you become covered under any other group short term disability plan, you will not be eligible for payments under this plan.

12

TM 00054

# Short Term Disability Coverage

## CLAIM INFORMATION

### When Do You Submit a Claim?

You are encouraged to submit your claim as soon as possible, so that a claim decision can be made in a timely manner. Written or telephonic notice of a claim should be sent within 30 days after the date your disability begins. However, you must send written proof of your claim no later than 90 days after your elimination period ends. If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity

The claim form is available from your Employer. If you do not receive the form within 15 days of your request, submit written proof of claim without waiting for the form.

Your Employer will tell you where to send the claim

### How Do You File a Claim?

You and your Employer must fill out your own section of the claim form and then give it to your attending doctor. Your doctor should fill out his or her section of the form and submit it as directed by your Employer.

### What Information Is Needed as Proof of Your Claim?

Your proof of claim, provided at your expense, must show:

1. That you are under the *regular care* of a *doctor.*

2. The appropriate documentation of your weekly earnings.

3 The date your disability began.

4. Appropriate documentation of the disabling disorder

5 The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation.

6. The name and address of any *hospital or institution* where you received treatment, including all attending doctors.

7. The name and address of any doctor you have seen.

You may be asked to send satisfactory proof of continuing disability, indicating that you are under the regular care of a doctor. This proof, provided at your expense, must be received within 30 days of the request.

In some cases, you will be required to give authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing

TM 00055

disability. Your claim may be denied or payments may stop if the appropriate information is not submitted.

*Regular care* means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and

- you are receiving the most appropriate treatment and care, which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

*Doctor* means:

a person who is performing tasks that are within the limits of his or her medical license; and

- is licensed to practice medicine and prescribe and administer drugs or to perform surgery, or

- has a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or

- is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Any relative including, but not limited to, you, your spouse, or a child, brother, sister, or parent of you or your spouse will not be recognized as a doctor for a claim that you submit.

*Hospital or institution* means an accredited facility licensed to provide care and treatment for the condition causing your disability.

## Who Will Payments Be Made To?

Payments will be made to you.

## What Happens If Your Claim is Overpaid?

Any overpayments due to any of the following reasons may be recovered:

- fraud;

- any error made in processing a claim; and

- your receipt of deductible sources of income.

You must reimburse the overpayment in full   You will be told the method by which you must repay the overpaid amount.

You will not be required to repay more money than the amount you were paid

TM 00056

# Glossary

*Active employment* means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least 29 hours per week if you are full-time. You must be working at least 20 hours per week if you are part-time.

Your worksite must be:

- your Employer's usual place of business;

- an alternate work site at the direction of your Employer other than your home unless clear specific expectations and duties are documented; or

- a location to which your job requires you to travel

Normal vacation is considered active employment.

Temporary and seasonal workers are excluded from coverage.

Individuals whose employment status is being continued under a severance or termination agreement will not be considered in active employment.

*Deductible sources of income* means income from deductible sources listed in the plan that you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

*Disability earnings* means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your greatest extent possible as explained in the plan. Salary continuance will not be included as disability earnings since it is not payment for work performed.

*Doctor* means

a person who is performing tasks that are within the limits of his or her medical license; and

- is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

- has a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients, or

- is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction

Any relative, including but not limited to, you, your spouse, or a child, brother, sister, or parent of you or your spouse will not be recognized as a doctor for a claim that you submit.

*Elimination period* means a period of continuous disability which must be satisfied before you are eligible to receive benefits under the plan.

*Employee* means a person who is in active employment with the Employer for the minimum hours requirement.

TM 00057

*Employer* means State Street Bank and Trust Company, and includes any division, subsidiary or affiliate

*Employment waiting period* means the continuous period of time that you must be in a covered class before you are eligible for coverage under a plan.

*Evidence that you qualify for coverage* means a statement of your medical history which will be used to determine if you are approved for coverage. This evidence will be provided at your own expense.

*Gross disability payment* means the benefit amount before any deductible sources of income and disability earnings are subtracted.

*Hospital or institution* means an accredited facility licensed to provide care and treatment for the condition causing your disability.

*Indexed monthly earnings* means your monthly earnings as adjusted on each July 1 provided you were disabled for all of the 12 months before that date. Your monthly earnings will be adjusted on that date by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-W) is published by the U.S Department of Labor. Some other similar measurement may be used if the Department of Labor changes or stops publishing the CPI-W.

Indexing is only used to determine your percentage of lost earnings while you are disabled and working.

*Injury* means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

*Law, plan or act* means the original enactment of the law, plan or act and all amendments.

*Layoff or leave of absence* means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer, other than for reasons in connection with any severance or termination agreement. Your normal vacation time, any period of disability or FMLA leave is not considered a temporary layoff or leave of absence.

*Material and substantial duties* means duties that

*   are normally required for the performance of your regular occupation; and

*   cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, you will be considered able to perform that requirement if you are working or have the capacity to work 40 hours per week

*Maximum period of payment* means the longest period of time payments will be made to you for any one period of disability

*Occupational sickness or injury* means an injury arising out of, or in the course of, any work for wage or profit regardless of employer, or a sickness covered, with respect to such work, by any workers' compensation law, occupational disease law or similar law.

*Part-time basis* means the ability to work and earn between 20% and 80% of your weekly earnings

16

TM 00058

*Payable claim* means a claim for which State Street Bank and Trust Company is liable under the terms of the Program

*Plan* means a line of coverage under the Program.

*Pre-existing condition* means a condition for which you received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medicines or followed treatment recommendation for your condition during the given period of time as stated in the plan.

*Regular occupation* means the occupation you are routinely performing when your disability begins Your occupation will be looked at as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

*Retirement plan* means a defined contribution plan or defined benefit plan. These are plans which provide retirement benefits to employees and are not funded entirely by employee contributions.

*Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.

*Weekly benefit* means the total benefit amount for which an employee is covered under this plan subject to the maximum benefit.

*Weekly earnings* means your gross weekly income from your Employer as defined in the plan

*Weekly payment* means your payment after any deductible sources of income have been subtracted from your gross disability payment.

*You* means a person who is eligible for coverage under the Program.

TM 00059

TM 00060

# ADMINISTRATIVE SERVICES AGREEMENT NO. 23403

effective January 1, 1996

between

## THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
### (The Prudential)

and

## STATE STREET BANK & TRUST COMPANY
### (Purchaser)

The Purchaser has the Plan of Benefits described in Exhibit A (herein called Plan) for the benefit of the classes of persons set forth in that Exhibit, and desires The Prudential to furnish the Services set forth in Exhibit B with respect to the Plan. The Prudential will perform these Services provided that the Purchaser makes payments for the Services as listed in Exhibit C. By their signatures below, The Prudential and the Purchaser agree that this Administrative Services Agreement which follows is approved and its terms are accepted. The provisions on the pages which follow as listed on the Table of Contents are part of this Agreement.

Date: _____, 19____          -STATE STREET BANK AND TRUST COMPANY-
                                                    (Purchaser)

Witness: _____          By: _____
                                                    (Signature and Title)

Iselin, NJ                                THE PRUDENTIAL INSURANCE COMPANY
                                                    OF AMERICA

June 16, 1997                            By: _____
                                                    Assistant Secretary

Attest _____

The authorized officers of The Prudential and the Purchaser have executed this Agreement in duplicate.

TM 00061

# TABLE OF CONTENTS

**AGREEMENT**

I      GENERAL PROVISIONS

II     OBLIGATIONS OF THE PURCHASER

III    OBLIGATIONS OF THE PRUDENTIAL

IV    CHARGES FOR THE SERVICES

V.    TERMINATION OF THE AGREEMENT

VI.   MISCELLANEOUS PROVISIONS

**EXHIBIT A - PLAN OF BENEFITS**

**EXHIBIT B - ADMINISTRATIVE SERVICES**

I.     CLAIM SERVICES

    A.    Claim Processing

    B    Determination of Eligibility for Benefits

    C.    Claim Review

II.    OTHER SERVICES TO BE FURNISHED IN CONNECTION WITH THE PLAN

    A.    Cost Analysis

    B.    Materials to be Furnished

    C    Other Services

III.   REPORTING DATES

**EXHIBIT C - SCHEDULE OF CHARGES**

TM 00062

## I.  GENERAL PROVISIONS

A.  **Fiduciary Duty:** It is understood and agreed that the Purchaser retains complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder, and that The Prudential is empowered to act on behalf of the Purchaser in connection with the Plan only as expressly stated in this Agreement or as agreed to in writing by The Prudential and the Purchaser.  The Purchaser and The Prudential agree that, with respect to Section 503 of the Employee Retirement Income Security Act of 1974, The Prudential will be the "appropriate named fiduciary" of the Plan for purposes of denial and/or review of denied claims under the Plan.  In exercising its fiduciary responsibility, The Prudential will have discretionary authority to determine eligibility for benefits as described in item I.B. of Exhibit B; to determine the amount of benefits for each claim received; and to construe the terms of the Plan.  However, the Purchaser will have the sole and complete authority to determine eligibility of persons to participate in the Plan.  The Prudential will have no other fiduciary duties under the Plan.

B.  **Hold Harmless and Indemnification:**  Prudential agrees to hold harmless and indemnify the Purchaser from any Indemnifiable Losses arising out of any function of The Prudential under this Agreement, provided that it is determined that the liability therefor was the direct consequence of gross negligence, criminal conduct or fraud on the part of The Prudential.

Except as described in the preceding paragraph, the Purchaser agrees to hold harmless and indemnify The Prudential from any Indemnifiable Losses arising out of any function of The Prudential under this Agreement (including but not limited to any Indemnifiable Losses arising from a breach of confidentiality in connection with any information or data relating to this Agreement released by The Prudential to the Purchaser, or to a third party at the request of the Purchaser, or from any services performed under this Agreement).

The Purchaser further agrees to hold harmless and indemnify The Prudential from any claim overpayment for which attempted recovery has been unsuccessful, which The Prudential at its sole discretion has determined to abandon, and from any levy, assessment or tax arising from any benefit under the Plan or any service or transaction under this Agreement, but excluding any tax on earnings or capital gains.

As used in this Agreement, the term Indemnifiable Losses will include any claim, damage, lawsuit, settlement, judgment or penalty, including attorney's fees and other expenses in connection therewith.

C.  **Lawsuits:**  Either party to this Agreement which becomes aware of a lawsuit which might give rise to an indemnification under this Agreement will notify the other party promptly in writing of the details of such lawsuit, except that any delay or failure to so notify the party whose obligation it is to indemnify will only relieve that party of its obligations hereunder to the extent it is prejudiced by reason of such delay or failure

Either party which has been named as defendant in such a lawsuit will retain the right to conduct its own defense.  However, the parties may mutually agree that one of the two parties will be responsible for the mutual defense of both parties.  In any event, the two parties will consult and cooperate with the objective of coordinating the overall defense of the case

If this Agreement terminates, the hold harmless and indemnification provisions above will continue to apply to any loss or cause of action arising out of any function of The Prudential under this Agreement prior to its termination.

TM 00063

## II.  OBLIGATIONS OF THE PURCHASER

A.  **Furnishing Information:** The Purchaser will have the obligation (1) to furnish any information required in accordance with Exhibit B when and as specified therein, (2) to establish and maintain any records required in accordance with that Exhibit, and (3) to furnish to The Prudential such other information required by The Prudential in order to provide the Services.

B.  **Prompt Discharge of Obligations:** The Prudential's performance of the Services will require prompt discharge by the Purchaser of such obligations. Therefore, The Prudential will not be considered to have failed to perform its obligations under this Agreement if any delay or non-performance is due, in whole or in part, to the Purchaser's failure to promptly discharge such obligations.

C   **Authorized Persons:** The Purchaser will provide The Prudential with the names of individuals authorized to act for the Purchaser in connection with this Agreement, together with the scope of their authority.

## III.  OBLIGATIONS OF THE PRUDENTIAL

A.  The Prudential will perform the Services set forth in Exhibit B on behalf of the Purchaser in connection with the Plan.

B   On the reporting dates specified in Exhibit B, The Prudential will report to the Purchaser the amount of the charges for the Services performed since the date of the last such report

C   The Prudential will furnish such other reports as may be mutually agreed upon in connection with this Agreement.

D.  The Prudential will maintain records used to perform the Services in accordance with The Prudential's then current rules for maintenance of claim files and other records.

## IV.  CHARGES FOR THE SERVICES

A.  **Payment of Charges:** Charges for the Services will be in accordance with the Schedule of Charges set forth in Exhibit C.  Charges will be payable to The Prudential by the Purchaser within thirty-one days after the billing date (the date on which The Prudential releases a notice to the Purchaser requesting payment of the charges for the Services performed) Also, at its option, The Prudential may exercise its right to terminate this Agreement as described in Section VI below

B.  **Changes in Charges:** The Prudential may change the Schedule of Charges as of any date on or after the first Agreement Anniversary Date.  The Agreement Anniversary Date is the 1st day of January of each year beginning in 1997.  The Prudential may also change the Schedule of Charges as of any date as a result of any modification of the Plan, or this Agreement, or any administrative procedure directly supportive of the Plan or this Agreement, as requested by the Purchaser and agreed to by The Prudential.

If such a change is in connection with a modification of the Plan or this Agreement, or in an administrative procedure, it will become effective on the effective date of the modification.  If such a change is not in connection with a modification of the Plan or this Agreement, or in an administrative procedure, it will become effective on the date specified, provided The

- 2 -

TM 00064

Prudential has given notice of the change at least sixty days prior thereto, and unless the Purchaser notifies The Prudential at least thirty days prior to such specified date of its intention to terminate this Agreement as of the date specified.

## V.  TERMINATION OF THE AGREEMENT

A   This Agreement will terminate upon the first to occur of the following:

1.   The expiration of thirty days after written notice has been given by The Prudential or the Purchaser of its intention to terminate because of the other's breach of material obligations under this Agreement;

2.   The date specified in a written notice given by The Prudential to the Purchaser of its intent to terminate this Agreement because of the Purchaser's failure to remit to The Prudential charges for Services within thirty-one days after the billing date;

3   Termination of the Plan;

4   Modification of the Plan, but such modification of the Plan will not operate to terminate this Agreement (a) if this Agreement is amended to make such modified plan the Plan under this Agreement or (b) while this Agreement is being continued, by mutual agreement between The Prudential and the Purchaser, prior to such amendment;

5.   The expiration of the day prior to any billing date if either The Prudential or the Purchaser has given at least thirty days prior written notice to the other of its intention to terminate this Agreement as of that billing date;

6.   The date a change in the Schedule of Charges is to become effective, in the event that the Purchaser notifies The Prudential at least thirty days prior thereto of its intention to terminate this Agreement.

B   **Forwarding of Records:**  In the event of termination of this Agreement, no further claims services will be furnished by The Prudential except as mutually agreed to by The Prudential and the Purchaser.  The Prudential will forward to the Purchaser such records as the Purchaser may reasonably require for the administration of the Plan or any plan adopted in its place   The cost incurred by Prudential for furnishing these records will be inventoried and charged to the Purchaser.

## VI.  MISCELLANEOUS PROVISIONS

A.   This Agreement, including its Exhibits, may be changed by an amendment hereto signed by the Purchaser and an officer of The Prudential.

B.   Any of the functions to be performed by The Prudential under this Agreement may be performed by The Prudential or any of its subsidiaries.  Any reference in this Agreement to The Prudential will include its directors, officers and employees as well as the directors, officers and employees of any of its subsidiaries.

C   Any references in this Agreement to the Purchaser will include its directors, officers, and employees acting in the course of their employment, but not as claimants.

TM 00065

Agreement No 23403
Effective Date January 1, 1996

## EXHIBIT A
## OF ADMINISTRATIVE SERVICES AGREEMENT NO. 23403

between The Prudential and the Purchaser

The term "Booklet" wherever used below refers to the document describing the Purchaser's "Plan of
Benefits" for the classes of persons indicated  The Plan of Benefits for each class of persons
indicated is determined by. (1) the Booklet that applies to that class; and (2) any modification to that
Booklet, provided the modification is listed below or is included in an amendment to this
Administrative Services Agreement.

The Plan of Benefits of the Purchaser applies to the class(es) of persons set forth below:

All Employees of the Purchaser who work for the Employer 1,000 hours or more in a Calendar
Year; and have completed one year or more of continuous service with the Employer; or work
for the Employer at least 36 1/4 hours per week as reported to Prudential.  Benefits for expenses
of a person's Weekly Disability Income Coverage as described in the Booklet entitled "Prudential
Long Term Disability Coverage and Administrative Services for Short Term Disability and
bearing the code "23403-WDI-ASO/LTD-INS; Ed. 1-97", made part of this Exhibit A.

- A: -

TM 00066

Agreement No. 23403
Effective Date. January 1, 1996

## EXHIBIT B
## OF ADMINISTRATIVE SERVICES AGREEMENT NO. 23403

### between The Prudential and the Purchaser

**Administrative Services to be furnished by
The Prudential in connection with
the Plan of Benefits described
in Exhibit A of the Agreement**

## I.   CLAIM SERVICES

A   Claim Consultation-While the Agreement is in effect, Prudential will assist the Purchaser in determining the validity of, or amount of benefits payable for, any claim for benefits under the Plan which is referred to Prudential by the Purchaser for such determination

B   Claim Control-Prudential will, at the Purchaser's direction, investigate the claim or have the claimant examined by a physician during pendency of claim.

C.  Claim Review-Periodically, Prudential will conduct surveys of claim payments made by the Purchaser.  The purpose of such surveys will be to verify the accuracy of payments, accuracy of proof of claim and eligibility of claimants for benefits.  Prudential will also examine the Purchaser's payment processing procedures to assist in preventing the misuse of the Purchaser's check.

## II.  OTHER SERVICES TO BE FURNISHED IN CONNECTION WITH THE PLAN

A.  Cost Analysis

1   Upon request of the Purchaser and receipt of any required information, The Prudential will furnish to the Purchaser an estimate of the benefit cost of any proposed modification or extension of the Purchaser's Plan of Benefits described in Exhibit A.  In connection therewith, The Prudential will notify the Purchaser of any changes in the Schedule of Charges under the Agreement which would be required if the Plan under the Agreement were so modified or extended.

2.  Annually, The Prudential will furnish to the Purchaser an analysis of the experience of the Plan which will include:

a   An estimate of incurred but unreported claims.

b   Benefit costs for the immediately preceding term of the Agreement.

c   Data required for compliance with governmental reporting requirements.

B   Materials to be Furnished:  Materials will be of the type normally prepared by The Prudential for the purpose intended unless special materials are requested by the Purchaser

TM 00067

Agreement No. 23403
Effective Date  January 1, 1996

    1.  The Prudential will, where requested by the Purchaser, prepare and furnish to the Purchaser:

        a.  For distribution to persons participating under the Plan, (i) a supply of cards on which the Purchaser can identify a person as a participant under the Plan and (ii) booklets and/or other communication material which will describe the benefits and such other conditions of the Plan as are agreed to by The Prudential and the Purchaser.

        b  A supply of forms to be used for submission of claims for benefits under the Plan and instructions for their use

        c.  A supply of forms to be used in administering the Plan and instructions for their use

    2.  Revisions of the booklets and/or other communication material will be prepared whenever required by revisions in the Plan under the Agreement and when requested by the Purchaser

    3.  The Prudential will also prepare the text of any amendments to the Agreement, including any amendment changing the Plan under the Agreement.

  C  **Other Services**

    1.  **Medical Exams or Inspection Reports:**  If the Purchaser requires information as to the health of any persons applying to participate in the Plan or to have their benefits thereunder increased, The Prudential will furnish forms to be used to elicit such information and will review and evaluate such information on the basis of its experience in such matters and the results desired by the Purchaser.  If requested by the Purchaser, The Prudential will also arrange for and/or evaluate medical examinations or inspection reports as to such persons.

    2  **Benefit Plan Design:**  The Prudential will, taking into account trends in employee benefits and health care costs, assist the Purchaser in the design of its Plan of Benefits described in Exhibit A and any desired revisions thereof.

## III.  REPORTING DATES as of which Required Information will be Furnished by the Purchaser and Reports will be Made by The Prudential to the Purchaser:

January 1, 1996 and the first day of each month thereafter.

TM 00068

Agreement No. 23403
Effective Date  January 1, 1996

## EXHIBIT C
## OF ADMINISTRATIVE SERVICES AGREEMENT NO. 23403

### between The Prudential and the Purchaser

### Schedule of Charges for the Services
### to be Furnished by The Prudential under the

### Agreement

A.   Basic Fee:  All services other than those described in B., C , D , E , F , G , and H  below:

.75 per Employees has been blended into the Insured Long Term Disability step rates

B    I.D. Cards and Claims and Administration Forms:  Any service provided in connection with producing identification cards, claim forms and administration forms, other than those normally provided by The Prudential:

Actual cost as inventoried.

C.   Communication Material:  Any service provided in connection with producing booklets or other communication material, other than the preliminary draft and one revision thereof.

Actual cost as inventoried.

D    Purchaser's Audit:

Actual cost as inventoried.

E.   Additional Reports Requested by the Purchaser:

Actual cost as inventoried.

F    Charges for Forwarding Records to the Purchaser upon Termination of the Agreement:

Actual cost as inventoried

TM 00069

U# 23403-100704

AMENDMENT TO GROUP CONTRACT NO. GW-23403

By their signatures below, the Contract Holder and Prudential agree that the Group Contract is changed as follows.

- Form 83500 SCH 1001(S-1), effective January 1, 2000 and attached to the Amendment to the Group Contract dated at Livingston, NJ on October 15, 2001, and the replacement specified in that Amendment with respect to such form are hereby declared null and void from said effective date.

- The Amendment to the Group Contract dated at Livingston, NJ on June 2, 2004, and the replacement specified in that Amendment with respect to such form are hereby declared null and void from said effective date.

- The insurance forms listed in Column I below are attached to this Amendment; they form part of the Group Contract as of its Effective Date  The form listed in Column I replaces, as of its Effective Date  the corresponding insurance form, if any, listed in Column II.

| Column I | Column II |
|---|---|
| 83500 SCH 1001A<br>effective January 1, 2000 | 83500 SCH 1001B<br>effective January 1, 1996 |
| 83500 SCH 1001B<br>effective January 1, 2001 | 83500 SCH 1001A<br>effective January 1, 2000 |

Date:                          , 20

Witness: _____

Livingston, NJ

November 3, 2004

- STATE STREET BANK AND TRUST COMPANY -
(Contract Holder)

By: _____
(Signature and Title)

THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA

By: *Michael G. Ferreto*
Vice President, Contracts

83500
AMD 1001

A

TM 00070

U# 23403-100704

AMENDMENT TO GROUP CONTRACT NO. GW-23403

By their signatures below, the Contract Holder and Prudential agree that the Group Contract is changed as follows:

- Form 83500 SCH 1001(S-1), effective January 1, 2000 and attached to the Amendment to the Group Contract dated at Livingston, NJ on October 15, 2001, and the replacement specified in that Amendment with respect to such form are hereby declared null and void from said effective date.

- The Amendment to the Group Contract dated at Livingston, NJ on June 2, 2004, and the replacement specified in that Amendment with respect to such form are hereby declared null and void from said effective date.

- The insurance forms listed in Column I below are attached to this Amendment; they form part of the Group Contract as of its Effective Date. The form listed in Column I replaces, as of its Effective Date, the corresponding insurance form, if any, listed in Column II.

| Column I | Column II |
|---|---|
| 83500 SCH 1001A<br>effective January 1, 2000 | 83500 SCH 1001B<br>effective January 1, 1996 |
| 83500 SCH 1001B<br>effective January 1, 2001 | 83500 SCH 1001A<br>effective January 1, 2000 |

Date: _____ , 20____     - STATE STREET BANK AND TRUST COMPANY -
(Contract Holder)

Witness: _____     By _____
(Signature and Title)

Livingston, NJ

THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA

By: _Michael G. Few. to_
Vice President, Contracts

November 3, 2004

.PRUDENTIAL'S COPY
PLEASE SIGN AND RETURN PROMPTLY

TM 00071

83500
AMD 1001                                                    A

# Schedule of Plans

Effective Date:  January 1, 2000

Group Contract No.:  GW-23403

This Schedule of Plans sets forth the Plan of Benefits that applies to each Covered Class under the Group Contract listed below as of the Effective Date.  The Plan of Benefits for a Covered Class is determined by: (1) the Group Insurance Certificates that apply to the Covered Class; and (2) any modification to those Certificates, provided the modification is listed below or included in an amendment to the Group Contract.  A copy of each Certificate and any modification to it are attached to the Group Contract and made a part of it.

Covered Class:

All Employees included in the Covered Classes of the Group Insurance Certificate(s) listed below

Plan of Benefits that Applies to this Covered Class:

The Coverage(s) described in the Group Insurance Certificate prepared for the Group Contract shown above:

(a)   With the Program Date of January 1, 2000;

(b)   and bearing the code "23403, LTD, FT Employees, ED 10-2004, 7".

_____

83500
SCH 1001A                                                                                              (23403)

TM 00072

# Schedule of Plans

Effective Date: January 1, 2001

Group Contract No.: GW-23403

This Schedule of Plans sets forth the Plan of Benefits that applies to each Covered Class under the Group Contract listed below as of the Effective Date. The Plan of Benefits for a Covered Class is determined by: (1) the Group Insurance Certificates that apply to the Covered Class; and (2) any modification to those Certificates, provided the modification is listed below or included in an amendment to the Group Contract. A copy of each Certificate and any modification to it are attached to the Group Contract and made a part of it.

Covered Class:

All Employees included in the Covered Classes of the Group Insurance Certificate(s) listed below.

  Plan of Benefits that Applies to this Covered Class:

    The Coverage(s) described in the Group Insurance Certificate prepared for the Group Contract shown above:

    (a) With the Program Date of January 1, 2001;

    (b) and bearing the code "23403, LTD, FT Employees, ED 10-2004, 8".

83500
SCH 1001B                                                              (23403)

TM 00073

EXHIBIT B

Close Window | Print Page | View PDF

 **PWBA Office of Regulations and Interpretations**

**Advisory Opinion**

September 30, 1992

Mr. Wayne W. Wisong                                92-18A
Constangy, Brooks & Smith                          ERISA SECTION
Suite 2400                                         3(1)
230 Peachtree Street, N.W.
Atlanta, Georgia 30303-1557

Dear Mr. Wisong:

This is in reply to your request for an advisory opinion regarding the applicability of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you ask whether the proposed Simmons Company Short-Term Disability Plan (the STD Plan) would be an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA.

You advise that the STD Plan will provide weekly income to certain non-bargaining unit employees unable to perform their regular duties due to illness, injury, or accident. The benefit to be paid under the STD Plan will vary depending upon the employee's length of service. The minimum benefit will be 100% of compensation for two weeks and 60% of compensation for 24 weeks for employees with between one and two years of service. The maximum benefit will be 100% of compensation for 9 weeks and 60% of compensation for 17 weeks for an employee with twelve or more years of service. The benefits will be paid solely by the employer out of its general assets.

Section 3(1) of Title I of ERISA defines the term "employee welfare benefit plan" to include:

> . . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarshipfunds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).

Thus, section 3(1) of Title I of ERISA would generally include any program established or maintained by an employer which provides benefits in the event of illness, accident or injury within the definition of an employee welfare benefit plan.

However, in regulation 29 CFR §2510.3-1, the Department of Labor (the Department) identified certain practices which would not constitute employee welfare benefit plans within the meaning of section 3(1) of Title I of ERISA. Specifically, §2510.3-1(b) provides, in pertinent part:

(b) Payroll practices. For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include --

                                    * * *

(2) Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment); . . .

Based on the information contained in your request, including the representation that no more than the employees' normal compensation will be paid on account of periods of disability, it is the view of the Department that the STD Plan is a payroll practice described in §2510.3-1(b)(2). Accordingly, the STD Plan would not be an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA and would not be covered by that Title.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of that procedure, including section 10 thereof relating to the effect of advisory opinions.

Sincerely,

ROBERT J. DOYLE
Director of Regulations
and Interpretations

Close Window  |  Print Page  |  View PDF

 **PWBA Office of Regulations and Interpretations**

**Advisory Opinion**

July 16, 1993

Mr. William J. Bernstein
The Coca-Cola Company
P.O. Drawer 1734
Atlanta, Georgia 30301

**93-20A**
ERISA SECTION
3(1)

Dear Mr. Bernstein:

This is in reply to your request for an advisory opinion regarding the applicability of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically you ask whether the Short-Term Disability Income Plan for Non-Exempt Employees of The Coca-Cola Company (the STD Plan) is an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA.

You advise that the STD Plan was adopted by The Coca-Cola Company (the Employer) on December 26, 1979. Section 2 of the STD Plan provides that the STD Plan was adopted "to establish the terms and conditions under which all or a percentage of certain non-exempt employees' regular salary or wages will continue to be paid while those employees are unable to work as a result of suffering a bona fide illness, disability or injury."[1] Section 5 of the STD Plan limits the employees eligible to participate to employees 1) whom the Employer classifies as non-exempt Regular, Part-Time, Limited Part-Time, and Seasonal employees, 2) who are not represented by a collective bargaining agent, unless the Employer and such agent agree that such employees shall be offered the opportunity to be covered by the STD Plan, and 3) who are assigned to specified domestic divisions, offices, departments, facilities, or components of the Employer. Under Section 9 of the STP Plan, the amount of an employee's benefits varies depending upon the employee's length of service and compensation, but in no event may the benefit exceed 100% of salary or wages for 52 weeks. Section 3 of the STD Plan provides that benefit payments shall be paid by the Employer from its general assets. The plan is neither funded nor insured.

The term "employee welfare benefit plan" is defined in section 3(1) of Title I of ERISA to include:

. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).

In 29 C.F.R. §2510.3-1, the Department of Labor (the Department) identified certain arrangements that would not be considered to constitute employee welfare benefit plans within the meaning of section 3(1) of ERISA. Specifically, regulation section 2510.3-1(b) provides, in pertinent part:

(b) Payroll practices. For purposes of Title I of [ERISA] and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include --

* * *

(2) Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment) . . .

Based on the information you submitted, it is the position of the Department that the STD Plan is a payroll practice described in regulation section 2510.3-1(b)(2) and does not constitute an employee welfare benefit plan within the meaning of section 3(1) of ERISA. The benefits under the STD Plan are paid out of the Employer's general assets, are paid only for periods of time during which the employee is disabled and thus unable physically or mentally to perform his or her duties, and do not exceed the employee's normal compensation.

This letter constitutes an advisory union under >ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of that procedure, including section 10 thereof relating to the effect of advisory opinions.

Sincerely,

ROBERT J. DOYLE
Director of Regulations
and Interpretations

[1] Section 2 of the STD Plan also provides that at some future date domestic subsidiaries of the Employer may be permitted to
adopt the STD Plan. Because your correspondence does not indicate that such domestic subsidiaries have been permitted to
adopt the STD Plan for their eligible employees, this letter is based on the assumption that only employees of the Employer are
permitted to participate in the STD Plan.

Close Window | Print Page | View PDF



**PWBA Office of Regulations and Interpretations**

**Advisory Opinion**

January 12, 1993

Mr. Daniel T. King                    **93-02A**
Unit Manager - Health & Disability    ERISA SECTION
AAA Michigan                          3(1)
1 Auto Club Drive
Dearborn, Michigan 48126

Dear Mr. King:

This is in reply to your request for an advisory opinion regarding the applicability of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you ask whether an income replacement program (the Program) that AAA Michigan offers its full-time employees who become disabled as a result of non-occupational illness or injuries is a payroll practice within the meaning of Department of Labor (the Department) regulation section 29 C.F.R. 2510.3-1(b) and, therefore, would not constitute an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA.

You advise that any employee who has completed 6 months of continuous service is eligible for the Program. After a covered employee has been absent for the greater of seven consecutive work days or the employee's accumulated sick leave, he or she will receive benefits that may continue for a maximum of 180 consecutive days or until the employee is no longer disabled, ceases to be an eligible employee, or dies. The Program's benefits are equal to 60 percent of salary for salaried employees, 60 percent of the previous year's W-2 earnings up to a maximum of $1,500 per month for commissioned employees, and 60 percent of the prior calendar year's W-2 earnings less overtime or shift premiums for travel agents. The Program was previously administered within AAA Michigan and paid from the employer's general assets. Effective July 1, 1990, the Program began to be administered by an independent administrator, Aetna Life Insurance Company, pursuant to an administrative services contract. AAA Michigan has established a special checking account from which all claims and fees due under the Program are paid. You have represented, and we assume for purposes of this advisory opinion, that this checking account is part of AAA Michigan's general assets.[1]

The term "employee welfare benefit plan" is defined in section 3(1) of Title I of ERISA to include:

. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchases of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).

In regulation section 29 C.F.R. 2510.3-1, the Department identified certain programs that would not constitute employee welfare benefit plans within the meaning of section 3(1). Specifically, regulation section 2510.3-1(b) provides, in pertinent part:

(b) Payroll practices. For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include -

* * *

(2) Payment of the employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties; or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment); . . .

It is the position of the Department that an employer's payment of less than normal compensation from the employer's general assets during periods in which an employee is absent for medical reasons may constitute a payroll practice that is not an employee welfare benefit plan. On the basis of your representations that the Program's benefits are paid exclusively from the general assets of the employer, notwithstanding the change in the administration of the Program, it is the position of the Department that the Program is not an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA, but instead constitutes a payroll practice within the meaning of regulation section 2510.3-1(b).

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject

to the provisions of the procedure, including section 10 thereof relating to the effect of an advisory opinion.

Sincerely,

ROBERT J. DOYLE
Director of Regulations
and Interpretations

---

[1] You have not inquired, and the Department expresses no view regarding, whether the assets in the checking account are plan assets. See, e.g., Advisory Opinion 92-24 (Nov. 6, 1992). As the Department explained in that opinion, an employer sponsor of a welfare plan may maintain such a plan without identifiable plan assets by paying plan benefits exclusively from the general assets of the employer. This would be true even if the employer set aside some of its general assets in a segregated employer account for the purpose of providing benefits under the plan. However, if the employer took steps that caused the plan to gain a beneficial ownership interest in particular assets, there would be, under ordinary notions of property rights, identifiable plan assets. For example, a welfare plan generally will have a beneficial interest in particular assets if the employer establishes a trust on behalf of the plan, sets up a separate account with a bank or other third party in the name of the plan, or specifically indicated in the plan documents or instruments that separately maintained funds belong to the plan.

Close Window | Print Page | View PDF



**PWBA Office of Regulations and Interpretations**

**Advisory Opinion**

October 12, 1993

Ms. Deborah Holland Tudor                    **93-27A**
Greenebaum Doll & McDonald                   ERISA SECTION
333 West Vine Street, Suite 1400             3(1)
Lexington, Kentucky 40507

Dear Ms. Tudor:

This is in reply to your correspondence on behalf of Toyota Motor Manufacturing, U.S.A., Inc. (hereinafter, the Employer) concerning applicability of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you request an advisory opinion concluding that the Employer's Short Term Disability Plan (hereinafter, Program A) and its Salary Continuation Plan (hereinafter, Program B) are payroll practices within the meaning of regulations of the Department of Labor (hereinafter, the Department) at 29 C.F.R. §2510.3-1(b) and therefore are not "employee welfare benefit plans" within the meaning of section 3(1) of Title I of ERISA.

You advise that Programs A and B (hereinafter, collectively, the Programs) provide employees with payments from the Employer's general assets during certain absences for medical reasons. The Employer set up Program A to cover all its regular, full-time active employees who are subject to the provisions of the Fair Labor Standards Act (hereinafter, FLSA). Program A pays eligible employees who are absent from work due to a "disability" 65 percent of their average biweekly compensation up to a maximum of $1,400 biweekly for no more than 26 weeks of absence.[1] A similar program, Program B, covers all the Employer's regular, full-time active employees who are FLSA-exempt and pays them up to 26 weeks at 100 percent of their rate of compensation at the time their covered absence due to a "disability" began.

Both Programs define "disability" as "a physical or mental condition of a Participant arising after the Effective Date which renders him incapable of performing any of his usual duties with the Company." The Programs further provide that "disability" does not include "injury or sickness due to employment with any other employer or self-employment, any injury which is self-inflicted or self-induced, or any injury due to employment with the Company which is covered by workers' compensation insurance."[2] Pursuant to an amendment effective April 2, 1990, Program A begins payments immediately for an eligible employee with a covered "disability" caused by accidental injury or due to outpatient surgery covered under the Employer's group health plan. However, payments pursuant to the Programs for any other "disability" within the meaning of the Programs begin only after an employee is absent 7 days.[3] The Employer's manager of personnel, as administrator of the Programs, determines who receives payments from the Programs and, pursuant to the terms of the Programs, bases his decision whether or not to make payments on "competent medical authority." In order to receive payments pursuant to its Programs, the Employer requires an employee to submit an application form that includes a medical authorization and release of information, required certification by the employee's attending physician, required certification by the Employer's industrial health services physician, and an agreement to reimburse any amounts received therefrom if recovery is also obtained from "a third party or his personal representative by judgment settlement or otherwise on account of the same bodily injuries or sickness."[4] Proposed amendments to the Programs provide that termination of employment with the Employer for any reason terminates an employee's rights to participate in, and to receive benefits from, the Programs. You also state that the proposed amendments are consistent with the Employer's intent and practice since the Programs' inception.

Your request for an advisory opinion involves interpretation of the term "employee welfare benefit plan," as defined in section 3(1) of Title I of ERISA. That section of ERISA defines the term "employee welfare benefit plan," in pertinent part, as

...any plan, fund, or program which was...or is...established or maintained by an employer...to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise,...benefits in the event of sickness, accident, [or] disability....

To clarify the scope of the "employee welfare benefit plan" definition, the Department identified in regulations at 29 CFR §2510.3-1(b) certain employer practices that would not be included within that definition. Regulation section 2510.3-1(b)(2) describes the following employer practice as excluded from the "employee welfare benefit plan" definition:

...[p]ayment of the employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties; or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment)....

In its previous advisory opinions, the Department has also taken the position that payment of less than normal compensation from an employer's general assets during periods in which an employee is absent for medical reasons may, under certain circumstances, also constitute an employer "payroll practice" which is not an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA. See, for example, ERISA Advisory Opinion 80-44A.

Based on your representations that payments pursuant to the Programs are made from the general assets of the Employer for absence due to certain medical reasons and that such payments either equal, or represent a significant portion of, an employee's normal compensation, but in no event exceed an employee's normal compensation, the Department concludes that the Programs constitute one or more employer "payroll practices" within the meaning of regulation section 2510.3-1(b)(2) and thus are not employee welfare benefit plans within the meaning of section 3(1) of Title I of ERISA.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of the procedure, including section 10 thereof relating to the effect of an advisory opinion.

Sincerely,

ROBERT J. DOYLE
Director of Regulations
and Interpretations

---

[1] Calculation of 65 percent of salary is based on compensation for the period of seven consecutive biweekly pay periods immediately prior to commencement of disability, minus any Social Security or Railroad Retirement benefits to which the employee is entitled during that period.

[2] Employees applying for payments from the Programs agree to refund any overpayments they receive from the Programs if also filing for worker's compensation, Railroad Retirement, Social Security, or other similar benefits.

[3] The Employer also has a "personal illness reimbursement days" policy which reimburses those employees with more than six months' service at the rate of 65 percent of compensation for three days of absence due to "disability" in each twelve month period, beginning on October 1. Employees may use their three reimbursement days during the seven day waiting period under the Programs.

[4] Because of the conclusion we reach in this advisory opinion, ERISA's preemption provision in section 514, among other provisions, does not apply to the Programs. Thus, ERISA does not preclude applicability of state law (e.g., state law allowing an accident victim's receipt of compensation for the same accident or injury both from an employer and from a third party insurer). See FMC Corp. v. Holliday, 498 U.S. 52 (1990).