UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 05-11283-NG

| | |
|---|---|
| TERESA A. MCCOY | ) |
| Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| PRUDENTIAL INSURANCE COMPANY | ) |
| OF AMERICA | ) |
| Defendant | ) |

**MEMORANDUM OF PLAINTIFF TERESA A. MCCOY
IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT SEEKING AN
AWARD OF LONG TERM DISABILITY BENEFITS, INTEREST AND ATTORNEYS'
FEES AND COSTS AGAINST PRUDENTIAL INSURANCE COMPANY OF AMERICA**

Plaintiff Teresa A. McCoy ("Mrs. McCoy")  seeks to recover Long Term Disability

benefits ("LTD benefits") under an insurance policy issued by defendant Prudential Insurance

Company of America ("Prudential") to Ms. McCoy's former employer, State Street Corporation[1]

("State Street") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"),

specifically 29 U.S.C. § 1132(a)(1)(B). Mrs. McCoy only seeks to recover LTD benefits from

Prudential for a finite period of time — from November 19, 2002 through November 19, 2004.

Mrs. McCoy has recovered from her illnesses and does not assert that she is entitled to benefits

after November 19, 2004.

In accordance with this Court's scheduling order, Mrs. McCoy files this memorandum in

support of her motion for summary judgment against Prudential. Alternatively, Rule 52 of the

---

[1]Mrs. McCoy settled her claims for Short Term Disability benefits with co-defendant
State Street Corporation. Those parties will be filing a stipulation of dismissal.

F.R.C.P., allows the Court to enter findings of fact and conclusions of law in plaintiff's favor See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094 (9th Cir.1999) (the Court recommended this method for resolving ERISA benefit cases in lieu of bench trials[2]).

## I.        PROCEDURAL HISTORY BEFORE THIS COURT

Mrs. McCoy commenced this suit on June 17, 2005.   She held off making service anticipating that Prudential would correct its wrongdoing by reviewing her claim again. On September 14, 2005, Mrs. McCoy delivered to Prudential  additional documents in support of her appeal of Prudential's claim denial. After Prudential failed to act promptly on the latest appeal, Mrs. McCoy served the complaint and summons on October 6, 2005.

The parties jointly moved this Court to stay the action so Prudential could again review the claim under the ERISA internal appeal process seeking to resolve the claim. Having failed to render a decision by mid-January 2006, Mrs. McCoy moved this Court to restore this case to the active docket. That motion was allowed.

A Rule 16 conference followed. In accordance with the Court approved scheduling order, Mrs. McCoy filed and served an amended complaint adding State Street as a party. Mrs. McCoy quickly settled her claim against State Street for STD benefits.

Mrs. McCoy then filed a motion to establish the standard of review as *de novo*. This

---

[2]In this Circuit, however, the District Courts have been instructed to use Rule 56 as the procedural vehicle for resolving ERISA benefit claims when there is *no* dispute of plan interpretation. See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir.2005). Here, McCoy contests the whether the "plan", in reality an insurance policy, confers discretionary authority on Prudential. As such, findings of fact and conclusions of law, or a bench trial would be an appropriate method for resolving this claim.

Court denied that motion on July 28, 2006.  This motion now follows in accordance with the Court's scheduling order.


II.　　　　　**SUMMARY OF PLAINTIFF'S ARGUMENT**

This Court must overturn Prudential's claim denial. Even if this Court concludes that Prudential's decision must be reviewed under the arbitrary and capricious standard of review (plaintiff contends the review must be *de novo*), Prudential's decision to deny benefits was not based on "substantial evidence", and as such was "arbitrary and capricious." See Giannone v. MetLife, 311 F. Supp. 2d 168, 177 (D. Mass. 2004) (Substantial evidence means actual evidence, not third-hand speculation).

Prudential's claim denial was based on the repeated opinion of an employee nurse who concluded that  all of Mrs. McCoy's treating and examining doctors (internists, neurologists and headache specialists) were wrong when each opined that Mrs. McCoy was disabled due to unremitting headaches, and pain from a left ulnar nerve[3].  See Gellerman v. Jefferson Pilot Ins. Co., 376 F.Supp2d 724, 735(S.D. Tex. 2005)(Level of deference due to fiduciary must be reduced when it relies on a nurse to override highly trained physician.).  Only after litigation commenced, did Prudential seek a paper review by a medical doctor. His opinion too is just as speculative as the employee nurse, as he failed to provide any reasoning why Mrs. McCoy could not have been disabled from working as suffered from chronic headaches. He did not address the ulnar nerve pain. As such, this Court should enter judgment for Mrs. McCoy.

---

[3]Mrs. McCoy underwent surgery two times during the pendency of this claim.

III.        **STATEMENT OF THE FACTS**

**A. Mrs. McCoy's Tenure With State Street.**

Mrs. McCoy had an effective date of employment with State Street of May 26, 1989. TM 542. In the Spring of 2002, she worked as senior reconcilement clerk. TM 540. She earned $31,416.00 per annum. TM 570. The position required using a computer on a cumulative basis for about 2 hours each day, sitting for 6 hours, walking for one half an hour, lifting up to fifteen (15) pounds. TM 549. As part of her benefits package with State Street, Prudential provided her with coverage "own occupation[4]" disability insurance coverage for twenty four (24) months for seventy percent (70%) of her annual salary. TM 570.

**B. The "Own Occupation" Disability Coverage.**

According to the insurance policy, Prudential was obligated to pay disability benefits to Mrs. McCoy when:

> You are disabled when Prudential determines that:
> You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
> You have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or injury. TM 13.

The insurance policy defines **Material and substantial duties** as:

> -are normally required for the performance of your regular occupation; and
> -cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week. Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week. TM 13.

_____

[4] The policy provides "any occupation" coverage after 24 months. Mrs. McCoy only seeks benefits during this "own occupation" period from November 19, 2002 through November 19, 2004

4

In addition, the policy permitted Prudential to have Mrs. McCoy examined by a physician, "We may require you to be examined by doctors...of our choice." TM 13.

### C. Mrs McCoy's Disabling Conditions.

It is undisputed that Mrs. McCoy began suffering from chronic headaches in March 2002 that continued until near the end of 2004. Even Prudential's consulting physician, Dr. Martin Gizzi, M.D., agreed,"Ms. McCoy's history and records are consistent with the diagnosis of chronic daily headache." TM 100.  In addition to chronic headaches, Mrs. McCoy also suffered from  a painful ulnar nerve that required surgery  in November 2003 and June 2004. TM 311; 326-328.

### 1. Mrs. McCoy Develops Debilitating Headaches.

On March 7, 2002, Dr. Antonio J. Vittug, M.D., a neurologist, examined Mrs. McCoy, and prescribed additional medications and scheduled follow up treatment. She had been referred to Dr. Vittug because of her persistent debilitating headaches. TM 435. On March 26, 2002, Mrs. McCoy again consulted with Dr. Vittug and reported that her new medications did not provide relief. TM 436. She again was examined by Dr. Vittug on April 10, 2002 and reported that her headache intensity had decreased but that she suffered drowsiness. TM 437.

On May 20, 2002, Dr. Vittug examined Mrs. McCoy. He noted that although she was alert, she "appeared tired." TM 439.  She reported that she again suffered from a tension headache. Dr. Vittug opined that she should take time off from work. TM 439. He prescribed amitriptyline, almotriptan and oxy-IR. TM 439. Three days later, Dr. Vittug, again examined Mrs. McCoy after she reported that her headaches had continued daily. TM 440. He prescribed additional medications. TM 440. On June 3, 2002, Dr. Vittug again examined Mrs. McCoy,

noted that her condition was not as bad as before. TM 441.  On June 17, 2002, Dr. Vittug

examined Mrs. McCoy, and although he concluded that her condition improved some, he noted,

"At this time, she is not ready to return to work." TM 442.  On July 8, 2002, Dr. Vittug

examined Mrs. McCoy and concluded that her situation had not improved. He referred her to Dr.

Michael Hayes, M.D., for botox treatment. TM 443.

On July 17, 2002, she underwent botox treatment. TM 444. On July 18, 2002, and July

22, 2002 Dr. Vittug examined Mrs. McCoy and noted that her condition was the same. TM 445.

On July 31, 2002, Dr. Vittug, M.D., wrote a narrative report and stated that Mrs. McCoy could

be expected to be out of work until September 2002[5]. TM 433.

On November 18, 2002, Mrs. McCoy was examined by another neurologist, Dr. Paul

Rizzoli, M.D. TM 448-449.  On December 19, 2002, Dr. Rizzoli completed a Headaches

Residual Functional Capacity Questionnaire and opined that Mrs. McCoy suffered from constant

generalized headaches that impacted her ability to sleep and to work on a regular basis. TM 483-

488. In terms of occupational impairment, Dr. Rizzoli opined that he expected that Mrs. McCoy

would be unable to engage in basic work activities while suffering from headaches and that she

would need to take unscheduled breaks from work during an eight (8) hour work day. TM 486.

After failing to obtain relief, on July 27, 2003, Mrs. McCoy began treating with the

headache pain management program at the Spaulding Rehabilitation Hospital. TM 74-90; 190-

201. On August 4, 2003, Mrs. McCoy began treating with the Director of the Pain Rehabilitation

Program and Director of Headache Management Program at the Spaulding Rehabilitation

Hospital,  a headache specialist, Dr. Elizabeth Loder, M.D. TM 89-90; 101-102; 150-152. Dr.

---

[5]She never returned to work because of her health conditions.

Loder prescribed a new treatment regime, noting in her records that Mrs. McCoy might have been suffering from headaches from past trauma and that she had very poor vision in her left eye. TM 151. On October 27, 2003, Dr. Loder's notes reflected that the intensity of Mrs. McCoy's headaches had decreased, but the frequency had not. TM 154. On January 19, 2004, Dr. Loder's notes stated in her RECOMMENDATIONS as follows:

> At this point with the failure of aggressive outpatient therapy to improve patient's situation, the development of possible medication overuse headache and her need for intensive multi disciplinary treatment, I would recommend an inpatient pain rehabilitation program....As we left things, we will seek approval for inpatient therapy. Otherwise, I have further suggestions for this patient's management and would return her to outpatient care to her referring physicians. TM 157.

Eventually by the end of 2004, Mrs. McCoy's headaches had been alleviated.

### 2. Mrs. McCoy Suffers From A Painful And Damaged Left Ulnar Nerve[6].

In November 2003, Mrs. McCoy also had to be treated for, and underwent surgery to repair a damaged ulnar nerve in her left elbow. TM 311. Dr. McNamee, M.D.'s note of December 1, 2003 states

> Teresa continues to have pain in her left arm, but the pain is different than it was before the surgery. She say the pain is now in her left hand. There is a burning pain that is constant, and it is really driving her crazy. TM 311    .

Mrs. McCoy continued to suffer a great deal of pain into 2004. This is reflected in her treating physician's notes of January 8, 2004,  "...but unfortunately the pain going down into the little finder and ring finger has not improved at all." TM 312; February 26, 2004, "She does have quite significant discomfort with palpitation..."

On June 2, 2004, Ms. McCoy underwent another procedure to treat the ulnar nerve with

---

[6]The ulnar nerve travels the length of the arm providing flexion to the wrist and hand.

Dr. Simon Cornelissen, M.D. TM 326-328. Post operative, her physician's notes reflected continuing pain, "She states she has continued pain." TM 315. An office note of October 23, 2004 states, "She continues to get a feeling of abnormal sensation in the ulnar border of her hand." TM 316.

### D.  Mrs. McCoy Seeks Disability Benefits From Prudential.

In late May 2002 Mrs. McCoy sought Short Term Disability benefits ("STD benefits") from Prudential.  TM 540; 542.  She advised Prudential that she had become disabled on May 20, 2002 due to unremitting headaches. TM 540.

Mrs. McCoy executed and delivered a blank medical release so Prudential could review her medical records and contact her health care providers. TM 538. She also supported her claim with an Attending Physician's Statement from her neurologist, Dr. Antonio J. Vittug, M.D., who opined that she was unable to work due to "severe headaches/fatigue. TM 540. Dr. Vittug, M.D., stated, "Teresa is presently have debilitating headaches rendering her incapacitated." TM 540.

Despite having zero evidence contradicting Dr. Vittug, M.D.'s conclusion, Prudential elected to deny Mrs. McCoy's claim. TM 545; 615-618.

### 1. Prudential's Lack Of Analysis And Summary Denial On June 18, 2002.

Prudential denied Mrs. McCoy's claim for benefits on June 17, 2002. TM 615-618. Without having Mrs. McCoy examined by a medical doctor, or having her records reviewed by a medical doctor, or requesting additional medical information or opinions from her neurologist or other medical caretakers, a Prudential nurse concluded, "Medical documentation supplied supports impairment for 3 days only." TM 544.

> EE is OOW with headache and malaise....Clinical recommends a duration of 1-3 days which does not exceed the 4 day elimination period. Medical does not

support beyon [sp] the 4 day waiting period. Recommend disallow/refer to dc. TM 545.

That appears to have been the full extent of Prudential's analysis of Mrs. McCoy's medical condition. No reason was provided why Dr. Vittug's opinion and analysis was incorrect and Prudential's nurse opinion carried more weight.

On June 18, 2002, Prudential sent to Mrs. McCoy a form letter denying her claim for benefits which stated in part, "The information in your file indicates that your disability began on May 20, 2002 due to XXX and XXX secondary to XXXX.")[7].  TM 616, ¶ 6. Prudential continued

The elimination period would be from May 20, 2002 to May 23, 2002. We are denying your claim based on the definition of Total Disability as seen in (1)(a) during the Elimination Period. You may have remained out of work longer than four days, however, the medical documentation submitted with your claim does not support a condition/impairment that would extend beyond the four day Elimination Period. TM 616.

### 2. Prudential Equated Driving A Car With Proof That Mrs. McCoy Was Not Disabled.

On September 26, 2002, Mrs. McCoy submitted to Prudential a detailed Activities of Daily Living form. TM 496-503. She reported that she suffered from constant headaches. TM 496. The form focused on household type activities rather than anything relating to Mrs. McCoy's occupation at State Street. She stated she could drive a car and provide some level of care to her household and children. TM 496-503.

Prudential concluded because Mrs. McCoy could drive a car and could provide some

---

[7]A signed and more complete copy of that letter appears at TM 295.

level of care for her children, that equated with being able to work on a consistent basis five (5)

days a week, forty (40) hours a week. TM 547. Prudential again made this conclusion on October

3, 2002. TM 549. This continued as more and more medical records were submitted to

Prudential. TM 549; 554-555. Each time Prudential denied the claim, it failed to provide a

meaningful analysis as to why Mrs. McCoy should not be believed and why her doctors were all

wrong.

IV.    **ARGUMENT**

**A. Standard of Review Should Be De Novo.**

Mrs. McCoy incorporates by reference her arguments from her motion and memorandum

dated June 22, 2006 with this Court that the review should be *de novo*. This Court is again

requested to review the recent ERISA decision in  Schwartz v. Prudential Ins. Co. of America,

457 F.3d 697 (7th Cir. 2006). There,  the Seventh Circuit reaffirmed its prior holdings from 2001

and 2005 that the Prudential insurance policy language in issue in  Schwartz, which is the same

as in this case,  failed to confer discretionary authority on Prudential, and as such the review had

to be *de novo*. See also, Nichols vs. Prudential Ins. Co., of Am. 406 F.3d 98, 108-09 (2nd Cir.

2005)("When Prudential determines" fails to confer discretionary authority.)

Another reason that this Court should determine this claim *de novo* is because after Ms.

McCoy afforded Prudential another opportunity to review the claim during the pendency of this

litigation. Prudential did not make a decision until January 30, 2006. That was one hundred and

thirty eight (138) days after Prudential received the request for review on September 14, 2005.

Under the applicable United States Department of Labor regulations in effect for post-

January 2002 claims,  29 C.F.R. § 2560.503-1(h), a plan administrator's decision reviewing a

denial of benefits must ordinarily be made within 45 days of the request for such review, but may be made within 90 days for special circumstances. 29 C.F.R. § 2560.503-1(h)(1)(I). Notice of any such extension must be given in writing before the commencement of the extension. 29 C.F.R. § 2560.503-1(h)(2). If no decision is rendered by the deadline, the claimant has fulfilled her duty to administratively exhaust the pre-litigation process. 29 C.F.R. § 2560.503-l(h)(4).

After the passage of ninety (90) days --one hundred and thirty eight (138) days in this instance – an administrator such as Prudential is divested of any discretionary authority that it may have had, and this Court, is now obligated to review this claim *de novo*. See Nichols, 406 F.3d at 105. ("Deemed denial" of claim for benefits based on plan administrator's failure to comply in any reasonable respect with regulatory deadlines also warranted review *de novo*, rather than under arbitrary and capricious standard).

Another reason to review this claim *de novo* is because of the structural conflict of interest, as Prudential serves as a fiduciary yet pays benefits from its own assets, rather than a funded trust, the District Court may strip Prudential of discretionary authority in reviewing a benefit decision. See Janeiro v. Urological Surgery Professional Ass'n., --- F.3d ----, 2006 WL 2241659 (1st Cir. August 7, 2006) at *7.(Where fiduciary labors under a conflict of interest, the Court may cede little deference or no deference to its decision[8]).

Finally, 29 U.S.C. § 1105 ( c) requires the Plan Administrator, if it elects, to vest an insurer with discretionary authority it must do so by written instrument. An insurer cannot vest

---

[8]This Court is urged to adopt the standard of the Eleventh Circuit for reviewing ERISA benefit denials. See Brown v. Blue Cross & Blue Shield, Inc., 898 F.2d 1556, 1566-68 (11th Cir. 1990)(inherent conflict of interest of having an insurer that pays benefits from its own assets requires reviewing a claim *de novo* and if the decision is *wrong*, the burden shifts to the insurer to prove that its conflict of interest did not infect the claim decision.)

itself with such authority. Specifically, Section 1105 ( c) entitled "Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities," states:

> (1) The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, **and** (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan. (Emphasis added.)

This statute is conjunctive and has been interpreted to allow a "named fiduciary" to delegate its fiduciary responsibilities under ERISA to a third party, however it may do so only if: (1) The written plan instrument expressly allows for the delegation, including explanation of the specific procedures that must be complied with in completing the delegation; and (2) there is an express delegation between the delegator and delgatee. See Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 584 (1st Cir. 1993) (1st Cir. 1993). ("To be an effective delegation of discretionary authority so that the deferential standard of review will apply, the fiduciary must properly designate a delegate for the fiduciary's discretionary authority."). Without a written delegation to State Street Prudential, Prudential could not have been vested with discretionary authority to make benefit decisions.

**B. Even Under the Deferential Standard or Arbitrary and Capricious Standard of Review Judgment Should Enter for Mrs. McCoy**

If this Court decides to invoke the deferential standard, the result should be the same – judgement for the plaintiff. "In order to find that an insurer had abused its discretion under the [insurance] contract, [the Court must]... conclude that the insurer's eligibility determination was unreasonable in light of the information available to it. " Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000). "Review under the deferential or arbitrary

and capricious standard is not a rubber stamp and deference need not be abject." See Hackett v. Xerox Long Term Disability Plan, 315 F.3d 771, 774 (7th Cir. 2003). Here, Prudential's decision to deny benefits to Mrs. McCoy was not reasonable based on the information that Prudential had available to it in its claim file; nor was Prudential's decision supported by substantial evidence. Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005). Substantial evidence is evidence "reasonably sufficient to support a conclusion." Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir.2001). "But one would think that substantial evidence means actual evidence, not third-hand speculation about the possible cause of a claimant's disability. Giannone v. MetLife, 311 F. Supp. 2d 168, 177 (D. Mass. 2004). In other words, an insurance company "does not act reasonably in denying benefits if faced, on the one hand, with substantial evidence of disability and, on the other, with only tentative and ambiguous evidence that might, or might not, favor denial of benefits." Stup v. Unum Life Ins. Co. of Am., 390 F.3d 301, 309 (4th Cir. 2004) (Court found for fibromyalgia claimant finding Unum's review of the evidence was not reasonable). In the present case, Prudential was faced with overwhelming evidence of occupational disability, yet wrongly denied Mrs. McCoy's claim for benefits. In so doing, Prudential relied on the opinion of its employee nurse and rejected the opinions of all of Mrs. McCoy's treating medical doctors.

### 1. Prudential's Wholesale Rejection Of Mrs. McCoy's Physicians Was Unreasonable.

Prudential's nurse rejected the opinion of each of Mrs. McCoy's physicians. She concluded that Drs. Vittug, Rizzoli,  Loder, McNamee, and Cornelissen were all wrong when they opined that she suffered from pain and could not work.  She concluded that Mrs. McCoy

should have been out of work 3 days rather than 4 or more. It was speculative that Prudential's nurse knew better than Mrs. McCoy's <u>own</u> examining and treating physicians. In the end, the Prudential nurse's opinions were unreliable. <u>See</u> <u>Gellerman v. Jefferson Pilot Ins. Co.</u>, 376 F.Supp2d 724, 735(S.D. Tex. 2005)(Level of deference due to fiduciary must be reduced when it relies on a nurse to override highly trained physician.). <u>See</u> <u>Stoyko v. Kemper Ins. Co.</u>, 124 Fed.Appx. 534, 536 (9th Cir 2005) (Claims administrator abused discretion by hiring physician file reviewer expert in muscle-skeletal injuries was inappropriate for evaluating neurological conditions). <u>See</u> <u>also</u> <u>Cook v. Liberty Life Assurance Co. of Boston</u>, 320 F.3d 11 (1st Cir. 2003) (Affirming district court decision for claimant when Liberty analyst handling Cook's claim concluded that there were no "clinical objective findings to support the fibromyalgia or chronic fatigue syndrome" diagnoses).

The claim record does not disclose anything about Prudential's nurse's background.  The record does not disclose anything about her education, training or experience in the treatment, care or diagnosis of the medical conditions affecting Mrs. McCoy. Likewise, nothing in the record discloses her education, training and experience to make impairment decisions. As a threshold requirement of reliability, the record should disclose this information. <u>See Morgan v. UNUM Life Ins. Co.</u>, 346 F.3d 1173, 1178 (8th Cir.2003) (Finding physician's opinion was not substantial evidence because, in part, the administrative record did not reveal the physician's expertise or experience in dealing with the ailment at issue). By relying on the nurse's opinion, Prudential engaged in conduct that is prohibited by the US Department of Labor regulations governing ERISA disability claims. In order to provide full and fair review, the Department of Labor claim regulations provide in pertinent part:

14

in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, ... the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. [29 C.F.R. § 2560.503-1(h)(3)(iii), as incorporated by 29 C.F.R.§ 2560.503-1(h)(4), and (iv)].

In plain English, this means that the insurer is required to consult with a health care professional who is knowledgeable in the claim area. A nurse is not knowledgeable when compared with a neurologist. As such, Prudential violated this regulation and Mrs. McCoy's right to "full and fair" review.

Dr. Gizzi's (the file reviewing doctor in December 2005) as well as Prudential's nurse's opinions seem to be based on an assumption that physical tests or laboratory reports would correlate with pain. This was not possible. Pain is always reported subjectively. There is no way to objectively measure pain. Common experience tells us, for example, that holding one's hand one inch over a lit candle will cause a painful burn. There is no device that can measure that pain. Fatigue is similar. Most people can observe another person's tiredness. But again the ultimate effects of fatigue are best described by the person reporting it. Had Prudential been interested in learning about Mrs. McCoy's condition it questioned, Prudential could have had her examined by a doctor of its choosing. The insurance policy permits an examination. TM 13[9]. Prudential chose not to. A file review, more than three (3) years after denying the claim was a poor substitute for an examination to determine the credibility of Mrs. McCoy's reports of pain.

An examining doctor has the ability to determine if a person's report of pain or fatigue is reasonable or exaggerated. That doctor has an opportunity to reach a conclusion by observing

---

[9]"We may require you to be examined by doctors...of our choice. TM 13.

and questioning that person. That is something a file reviewing doctor cannot do. The file

reviewer is limited to guessing when it comes to making a credibility assessment. Here, each of

Mrs. McCoy's treating physicians had an opportunity to assess her reports of pain. They each

found her credible. Not a single physician found that her report of headache pain was

exaggerated. As such, Prudential was required to rely on those opinions, or only reject the

opinions if it had reliable competing evidence supporting its position. Because it did not,

Prudential should have paid benefits.

### 2. Prudential Chose Unreliable Evidence Over Reliable Evidence.

Prudential relied on a  speculative medical opinion of its employee nurse over the

opinions of Ms. McCoy's multiple treating physicians. The nurses opinion was not reliable.

Reliability presupposes that a health professional offers an opinion within the sphere of that

person's knowledge, and there is a sound basis supporting the ultimate conclusion. Evidentiary

admissibility requires that "a reliable expert opinion must be based on scientific, technical, or

other specialized *knowledge* and not on belief or speculation, and inferences must be derived

using scientific or other valid methods." Oglesby v. General Motors Corp., 190 F.3d 244, 250

(4th Cir.1999). Merely because the evaluator's name is followed by the title "registered nurse" or

even "M.D." does not make that person's opinion reliable.  Prudential's nurse's opinion was not

sufficiently reliable under the standard announced in Daubert v. Merrill Dow Pharmaceuticals,

Inc., 509 U.S. 579 (1993), and Kumho Tire Co., v. Carmichael, 526 U.S. 137(1999), and would

not qualify as admissible expert evidence in a court action. "Nothing in either Daubert or the

Federal Rules of Evidence requires a district court to admit opinion evidence which is connected

to existing data only by the *ipse dixit* of the expert." Ruiz-Troche v. Pepsi Cola of Puerto Rico

Bottling Co.,161 F.3d 77, 81 (1st Cir. 1998). Self serving opinions, and those of Prudential, are not based on sound medical science and are merely *ipse dixit* opinion that are unreliable and inadmissible in a Court action.

Plan fiduciaries must weigh the reliability of competing opinions of consulting and treating physicians. *See,* Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833, 123 S.Ct. 1965 (2003)[10]. In this regard, a fiduciary may not refuse to credit the opinion of a treating physician, if such evidence is "reliable." Likewise, a fiduciary cannot credit the evidence of its employee or even a consulting physician unless that evidence is reliable.[11] Nord does not stand for the proposition that retained consultants, or employees may be preferred over treating physicians. Nor does it insulate an insurer when it elects to overrule a treating doctor's report in favor of its retained consultant's opinion or that of an employee. See Stup v. Unum Life Ins. Co. of Am., 390 F.3d 301, 309 (4th Cir. 2004).  (Reversing District Court that permitted LTD Plan to rely on unreliable consultant).

Among the factors that may be considered in evaluating reliability are:

(1) whether the consultant had an "incentive" to make a finding of not disabled.

See Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 527-531 (6th Cir.

---

[10] The Supreme Court noted that, as a rule, compared to consultants retained by a plan, treating physicians may have a greater opportunity to know and observe the patient as an individual. Nord, 538 U.S. at 832.  The Court further noted that medical consultants hired by benefits plans have an incentive to make a finding of "not disabled" to save their employers money and preserve their own consulting arrangements. *Id.*

[11] Nord holds that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Nord, 538 U.S. at 834.  (emphasis added).

2003)(There may be incentive for LTD Plan to contract with medical review company that makes findings favorable to fiduciary.);

(2) whether the consultant physically examined the claimant. See Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir., 2005)(LTD fiduciary acted arbitrarily and capriciously in denying benefits in part for failing to conduct physical exam where the LTD Plan allows for it, particularly where claimant's pain reports required credibility assessment.); or

(3) wwhether the consultant describes why s/he disagrees with the findings of the treating physician who had an opportunity to examine the claimant on numerous occasions and whether the consultant fails to address pieces of evidence in the file.  See Kalish v. Liberty Mutual/Liberty Life Ass. Co. of Boston, 419 F.3d 501, 506-511(6th Cir. 2005)(LTD fiduciary acted arbitrarily and capriciously in denying benefits where consulting physician's report did not explain why treating physicians were wrong but merely contended claimant could work).

The minimum integrity requirements of Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993) [12] and Federal Rule of Evidence 702 provide additional guidance for applying the reliability requirements of Nord.  Daubert teaches that an expert opinion cannot be reliable unless it is based upon complete and accurate data and arrived at by a methodology that is

---

[12] There is no reason for disregarding a generally applicable Supreme Court case and the Federal Rules of Evidence. There is nothing in ERISA that says the Federal Rules of Evidence and Rules of Civil Procedure do not apply and Supreme Court precedents should be ignored as well. Mark D. DeBofsky, *The Paradox of the Misuse of Administrative Law in ERISA Benefit Claims,* 37 J. Marshall L.Rev. 727, 742-43 (2004).

generally accepted by the expert's peers.  See Troche v. Pepsi Cola of Puerto Rico Bottling Co.,161 F.3d 77, 85 (1st Cir. 1998)(The proponent of expert evidence must demonstrate that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.).

 In the present case, Nord, Daubert and Rule 702 required  that the expert report of Prudential's consultant be discredited. Dr. Gizzi was guessing about Mrs. McCoy's condition. Although he acknowledged that her medical records were consistent with a diagnosis of daily headache, he concluded, without having ever examined her, that her headaches were not so debilitating that she could not work. TM 100. Dr. Gizzi, acknowledged in some instances that daily headaches can be debilitating and preclude individuals from working: "Chronic daily headache, is rarely, if ever, disabling.." TM 100. Why Dr. Gizzi concluded that Mrs. McCoy's headaches did not fall into this limited group which he acknowledges exists, demonstrates that Dr. Gizzi was "guessing" about Ms. McCoy's condition from November 2002 - November 2004. The video surveillance that he relied on in November 2005 is irrelevant, because Mrs. McCoy concedes that she was not longer disabled. In the end, Dr. Gizzi's opinion is nothing more than a guess.   Unreliable opinions cannot be considered "substantial evidence." Giannone v. MetLife, 311 F. Supp. 2d 168, 178 (D. Mass. 2004).

### C. Prudential's Reliance On Dr. Gizzi's Opinion Offends the Notion of Full And Fair Review.

Dr. Gizzi's opinion must be ignored. It was obtained more than three (3) years after Prudential initially denied the claim, and once the claim record had been effectively closed. By relying on an opinion that was never the basis of the initial claims denial violates all notions of

"full and fair review" required under ERISA. Indeed, by obtaining Dr. Gizzi's opinion in early December 2005, and failing to disclose it until a January 30, 2006, Prudential violated the basic tenets of "full and fair review." See Abram v. Cargill, Inc., 395 F.3d 882 (8th Cir.2005)(Full and fair review under ERISA precludes a fiduciary from relying on an expert opinion and then closing the claim file before the participant has a chance to review the report and respond to it.).

ERISA mandates that specific reasons for the denial of benefits be communicated to the claimant. See Schneider v. Senty Group Long Term Disability Plan, 422 F.3d 621, 627-628 (7th Cir. 2005) (Entry of judgment for claimant when denial letter did not set forth specific reasons for benefit termination and only provided conclusions). The relevant portion of ERISA provides:

In accordance with regulations of the Secretary, every employee benefit plan shall--

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.  29 U.S.C. § 1133.

Furthermore, federal regulations, promulgated pursuant to ERISA and in force at the time the June 18, 2002 letter was sent, set forth the following requirements for the notification of an adverse benefit determination:

The notification shall set forth, in a manner calculated to be understood by the claimant--
(I) The specific reason or reasons for the adverse determination;
(ii) Reference to the specific plan provisions on which the determination is based;
(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
(iv) A description of the plan's review procedures and the time limits applicable to such

procedures ....

    29 C.F.R. § 2560.503-1(g).

Prudential violated the regulation by attempting to support a claim denial with no

evidence after litigation had commenced and after the claim record had been close. As such the

opinion must be ignored.

## CONCLUSION

For the foregoing reasons, Mrs. McCoy's motion for summary judgment should be

allowed and Prudential's denied.

**TERESA A. MCCOY**
By Her Attorneys,
*/s/ Jonathan M. Feigenbaum*

_____

Jonathan M. Feigenbaum, Esq.
B.B.O. N#546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. : (617) 367-8787

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

(NEF), and paper copies will be sent to those indicated as non-registered participants on this

18th day of August 2006.

*/s/ Jonathan M. Feigenbaum*

L:\LITG\Tmcc001\SJ Materials\memo sj mccoy.wpd